6IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JENNIFER A. HUBER, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:07-CV-477-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER</u>

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

<u>FINDINGS AND CONCLUSIONS</u>

A.     STATEMENT OF THE CASE

Plaintiff Jennifer A. Huber filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. Huber applied for SSI benefits and disability insurance benefits on March 22, 2004, alleging that her disability began January 2, 2000. (Tr. 60, 274). She maintained her insured status for purposes of disability insurance benefits at all times relevant to the Commissioner's decision. (Tr. 24, 63).

The Social Security Administration denied Huber's application for benefits both initially and on reconsideration. Huber requested a hearing before an administrative law judge (the "ALJ"), and ALJ J. Frederick Gatzke held a hearing on September 27, 2006 in Fort Worth, Texas. (Tr. 294). Huber was represented by counsel. On December 27, 2006, the ALJ issued a decision that Huber was not disabled and was not entitled to disability insurance or SSI benefits. (Tr. 18-25). The ALJ's decision is the final decision of the Commissioner because the Appeals Council denied Huber's request for review. (Tr. 6).

B.     STANDARD OF REVIEW

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.     ISSUES

Whether the ALJ complied with the relevant legal standards for weighing opinions offered by the state agency medical consultants at previous stages of the administrative proceedings.

D.   ADMINISTRATIVE RECORD

   1.   Treatment History

The administrative record provides the following information about Huber's impairments: Huber was born November 8, 1975. (Tr. 60). She obtained a GED in 1993 and certification as a massage therapist in 1995. (Tr. 77). She reported being diagnosed with bipolar disorder in 2002 and received treatment on an outpatient basis, but those treatment records are not included in the administrative record. (Tr. 19, 217).

Huber went to the psychiatric triage unit at Green Oaks Hospital on April 22, 2003. (Tr. 126). She was paranoid and suffering from psychosis, with a current Global Assessment of Functioning (GAF) score of 40.[1] She was discharged with prescriptions for mood stabilizers and anti-psychotic medications, but returned two days later because she could not tolerate her medication. (Tr. 124). The triage nurse noted hypomania and delusions, as illustrated by Huber's claim that she was being attacked "through the astral plane." Huber was diagnosed with a schizoaffective disorder, bipolar type. Her medications were changed, and her current GAF score was listed as 45.[2] (Tr. 124).

On May 3, 2004, Huber saw a physician with the Methodist Family Health Center for a follow-up visit for attention deficit disorder and depression. She reported doing well and was

---

[1] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* at 34.

[2]. A GAF score of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *Id.* at 34.

compliant with her medication. (Tr. 128).

Huber attended a consultative psychiatric evaluation with Hadi Tajani on June 2, 2004. (Tr. 130). She complained of problems focusing, depression, and concerns about her terminally ill mother. She reported being diagnosed with an attention disorder as a child. She explained that her bipolar disorder surfaced after she became involved in a "bad relationship" and began misinterpreting things and feeling paranoid. She reported a previous hospitalization for psychotic episodes and had been fired from her most recent job after having a psychotic episode at work. Medication helped, but had side-effects. Huber complained of low energy, poor memory and concentration, and distractibility. (Tr. 130). She enjoyed working and caring for her mother, and she denied having suicidal or homicidal ideations or hallucinations. Her current medications included Lithium, Lexapro, and if she could afford it, Adderall for her attention disorder. (Tr. 131). Huber denied any current substance abuse, although she had used cocaine and ecstasy when she was younger. She confided that she had been a childhood victim of sexual abuse by her father and half-brother, and she had been physically abused by other family members. (Tr. 131).

Tajani found Huber to be cooperative and oriented. Her speech was clear and coherent, but somewhat rapid and pressured, and her thought processes were goal-directed. Tajani reported that Huber's mood was hypomanic, with a labile affect, but there was no evidence of hallucinations or delusions. (Tr. 131-32). Huber exhibited poor concentration, and Tajani found that Huber had difficulty maintaining pace due to her emotional problems. Huber's daily activities included taking her medications, feeding her cat, working part-time as a massage therapist, preparing meals, cleaning her home, calling her mother, and watching television, but she did not read or keep up with current

events. (Tr. 132). Tajani diagnosed bipolar disorder and attention deficit/hyperactivity disorder, with a fair prognosis. (Tr. 132).

Huber sought treatment with Tarrant County Mental Health and Mental Retardation services (MHMR) in April 2005 for years of erratic behavior. (Tr. 219-23). Staff psychiatrist Davinder Dhingra, M.D., diagnosed bipolar disorder and attention deficit/hyperactivity disorder, with a current GAF score of 50. Dhingra noted that Huber's condition was stable with medication, and he continued Huber on Lithium, Lexapro, Xanax, and Adderall. (Tr. 215).

During follow-up visits with MHMR in June and August, Huber remained depressed and anxious. (Tr. 191, 194). In September, she was described as anxious, talkative, and loud, but pleasant. (Tr. 189). Her mood was more depressed when she was seen in October and November 2005. (Tr. 184-87). She reported continued financial problems and stress with her mother, who was refusing to talk to her. It was noted that Huber had a tendency to be noncompliant with her medications and appointments. (Tr. 184). Dhingra prescribed a new antidepressant, but Huber could not tolerate the new medication and was restarted on Lexapro in December. (Tr. 180-81).

In February 2006, Dhingra opined that Huber's condition had partially responded to medication, but Huber had been stressed by a recent apartment fire that destroyed some of her personal belongings. (Tr. 178-79). After February, Huber stopped taking her medication and her condition deteriorated, which she attributed to MHMR's cancellation of her follow-up appointment. (Tr. 264-67).

Huber was hospitalized at Trinity Springs Pavilion, a psychiatric center, on July 8, 2006, pursuant to a detention warrant that was obtained after the police arrested her for running naked

down the street. (Tr. 266). She believed that the devil was in her apartment and that she was being held captive by terrorists. (Tr. 269). On admission, she was noted to be unkempt; her speech was pressured and rapid; her mood was anxious; and she was hyperactive and impulsive. Huber was experiencing hallucinations and thought threatening messages were being broadcast on her television. Huber was admitted with a GAF score of 35. Huber responded to medication and was discharged July 17, 2006, on "furlough status" with an ongoing outpatient treatment program. (Tr. 253-54).

Huber was scheduled to attend a hearing on her social security disability applications on July 20, 2006, but became paranoid and refused to leave her apartment on the day of the hearing. (Tr. 307). Huber's furlough was revoked on July 25, 2006, and she was readmitted to Trinity Springs Pavilion for her failure to comply with treatment. (Tr. 225). On assessment, she exhibited a labile mood, anxiety, and psychosis. She had suspicious and persecutory delusions, and reported changing her telephone numbers in order to be safe. She was described as inappropriately euphoric during her hospitalization, and in one instance, was found in the hallway performing jumping jacks. Huber responded to treatment and was discharged on August 3, 2006, with a prescription for a new anti-psychotic medication. (Tr. 225-27).

2. Administrative Hearing

Huber testified that she was thirty years old and had a GED. She had worked part-time as a massage therapist, but quit working after her personal property was destroyed by an apartment fire in December 2005. (Tr. 296-97). She testified that she suffered a breakdown in July 2006 that

required hospitalization,[3] which she contributed to her living arrangements at that time. She had moved in with friends after she was discharged from the hospital. (Tr. 298). Her friends prepared her meals, but she tended to her own personal hygiene. Huber testified that her medications made her sleepy, constipated, and unable to focus. She usually fell asleep at 4:00 or 5:00 a.m. (Tr. 299). Huber testified that she attended counseling on a monthly basis and intended to have her medications changed at her next visit because of the side-effects. (Tr. 300).

Vocational expert Donna Freeze testified that massage therapy is a semi-skilled occupation that requires medium exertion, although Huber described the job as requiring light exertion. Huber also had experience as a sales clerk or cashier, which was semi-skilled work requiring light exertion. (Tr. 301). The ALJ asked the vocational expert to consider a claimant who was limited to work requiring only incidental contact with the public and the lower end of detailed work instructions. Freeze testified that Huber's past work would be unsuitable, but there would be other entry level jobs available. Examples included assembly positions (with 60,000 jobs in Texas and 1,000 jobs in the nation), hand packing jobs (with 15,000 jobs in Texas and 350,000 in the nation), and janitorial positions (with 200,000 jobs in Texas and 2,500,000 in the nation). (Tr .301-02). Freeze testified that the assembly and hand-packing jobs were more production-oriented and janitorial work was more self-paced. (Tr. 302).

3. ALJ Decision

The ALJ found that Huber had not engaged in substantial gainful activity since January 2000.

---

[3] In her brief, Huber asserts that she was hospitalized for a third time in August 2006, (Pl. Br. 10), but in her testimony, Huber recounts only two hospitalizations–the initial hospitalization in July and her second admission approximately one week later. (Tr. 298).

He also found that she had severe impairments, including bipolar disorder and a history of attention deficit/hyperactivity disorder. The ALJ found that Huber's mental impairments had resulted in mild restriction in her activities of daily living; marked difficulty in social functioning; moderate difficulty in her ability to maintain concentration, persistence, or pace; and one episode of decompensation. (Tr. 24). The ALJ found that Huber had no impairment or combination of impairments meeting or equaling the severity of any listed impairment. He also observed that Huber, when compliant with her treatment regimen, was stable, self-sufficient, and able to work a significant number of hours at semi-skilled work that had required close interpersonal contact. The ALJ found that Huber was capable of the sustained performance of jobs at the lower end of detail that required only incidental contact with others. (Tr. 22). He also found that Huber had no exertional or physical restrictions. (Tr. 24). Based on the vocational expert's testimony, the ALJ found Huber was able to perform jobs existing in significant numbers in the national economy, including work as an assembler, hand packer, or janitor. The ALJ concluded that Huber was not entitled to disability insurance or SSI benefits. (Tr. 25).

E.  DISCUSSION

Huber contends that the ALJ erred by adopting some of the opinions of the state agency medical consultants (SAMCs) and rejecting others without explanation. Findings of fact made by state agency medical and psychological consultants regarding the nature and severity of an individual's impairments are treated as expert opinion evidence from non-examining sources at the administrative hearing and Appeals Council levels of review. 20 C.F.R. §§ 404.1527(f), 416.927(f); SOCIAL SECURITY RULING 96-6p. The administrative law judge and the Appeals Council are not

bound by the state agency physicians' opinions, but may not ignore them and must explain the weight given to these opinions in their decisions. SOCIAL SECURITY RULING 96-6p. The agency must follow its own procedures, even if the procedures are more rigorous than what would otherwise be required. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. [Unit A] 1981)(per curiam), *cited in Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000). If the agency violates its rules and prejudice results, the proceedings are tainted and any action taken cannot stand. *Hall*, 660 F.2d at 119.

State agency psychology consultant Charles Lankford, Ph.D., reviewed Huber's disability claim at the initial administrative stage. Lankford found that Huber had bipolar disorder, which caused no restriction in her activities of daily living, mild difficulty in her ability to maintain social functioning, moderate difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 140-53). Lankford also completed a mental residual functional capacity assessment. (Tr. 134). In the "Summary Conclusions" portion of the Mental Residual Functional Capacity assessment form, Lankford found no significant limitation in Huber's ability to perform the following activities on a sustained basis:

- remember locations and work-like procedures;
- understand, remember and carry out very short and simple instructions;
- perform activities within a schedule, maintain regular attendance, and be punctual;
- sustain an ordinary routine without special supervision;
- make simple work-related decisions;
- interact appropriately with the general public;
- ask simple questions or request assistance;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
- be aware of normal hazards and take appropriate precautions;
- travel in unfamiliar places and use public transportation; and

- set realistic goals and make plans independently

(Tr. 134-35). Lankford found moderate limitation in Huber's ability to

- understand, remember and carry out detailed instructions;
- maintain attention and concentration for extended periods;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- accept instructions and respond appropriately to criticism from supervisors; and
- respond appropriately to changes in work setting.

(Tr. 134-35). Lankford found no areas of marked limitation in functioning. In assessing Huber's overall functional capacity, which is a separate determination recorded on the assessment form, Lankford opined that Huber was capable of understanding and carrying out simple instructions in a routine work-setting. (Tr. 136). On reconsideration, state agency psychology consultant Nancy Wilson affirmed Lankford's assessment as written. (Tr.136, 140).

The ALJ followed the technique prescribed by the regulations for evaluation of a claimant's mental impairments. *See generally* 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ found that Huber's mental impairments were severe and had led to mild restriction in her activities of daily living; marked difficulty in her ability to maintain social functioning; moderate impairment in her ability to maintain concentration, persistence or pace; and one episode of decompensation. (Tr. 24). Proceeding with the sequential evaluation process, the ALJ found Huber retained the mental residual functional capacity (RFC) for work at the lower end of detail that required only incidental contact with the public. The ALJ also provided the following discussion of the opinions offered by Lankford and Wilson:

> Pursuant to 20 CFR 404.1527 & 416.927 and SSR 96-6p, I considered the non-binding severity and functional capacity proposals issued by the DDS psychologists at the pre-hearing stages. The DDS psychologists suggested that the claimant retains the work-related mental abilities for unskilled work duties in routine work environments (exhibit 4f) and I find that these proposals are well supported by the credible evidence and, although not required to do so, I have generally endorsed the limitations established below.

(Tr. 21).

Huber contends that the ALJ, despite finding that the SAMCs' opinions were well supported, reached a decision that is inconsistent with their opinions that she has limited ability to work in coordination with others; complete a normal workday and workweek and work at a consistent pace; accept instructions and respond to criticism from supervisors; and respond appropriately to changes in work setting. She agrees that some of the SAMCs' opinions are incorporated in the ALJ's assessment of her RFC, but not their opinions with respect to these four mental activities. Huber concedes that there is no requirement that the ALJ provide a detailed discussion of each of the factors specified in Section 404.1527(d) and 416.927(d) when explaining the weight assigned to non-examining medical sources like SAMCs, but asserts that the ALJ was required to explain why he adopted some of the SAMCs' opinions and rejected others.

Huber relies on a set of cases decided by the Tenth Circuit in 2007: *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), which was followed by *Confere v. Astrue*, 235 Fed. App'x 701 (10th Cir. 2007) and *Frantz v. Astrue*, 509 F.3d 1299 (10th Cir. 2007).[4] In *Haga v. Astrue*, an examining doctor

---

[4] Huber also relies on *McCloud v. Barnhart*, 166 Fed. App'x 410 (11th Cir. 2206), to support her position that the ALJ must articulate the weight given to a state agency psychologist's opinions. The Eleventh Circuit found error because the ALJ had relied on the SAMC's opinions to refute other evidence of record, but never explained the weight he was giving to those opinions as required by 20 C.F.R. § 404.1527(f). *Id.* at 419. The appellate court's unpublished decision does not indicate that the ALJ in that case provided a discussion similar to the explanation that the ALJ provided in addressing the state agency consultants' assessments in Huber's case.

-11-

assessed Haga as suffering from moderate impairment in seven out of ten categories of work-related mental functioning. *Haga*, 428 F.3d at 1207. The administrative law judge's RFC assessment reflected some of the limitations, but not others. *Id*. The Tenth Circuit Court of Appeals held that reversible error existed because the administrative law judge had violated circuit precedent that required the ALJ to explain why he had rejected some of the physician's uncontroverted findings, while implicitly adopting others. *Id*. at 1208.

The Tenth Circuit adhered to that same case precedent in its unpublished opinion in *Confere*. The ALJ had failed to address the state agency consultant's assessments of marked and moderate limitations in Confere's mental functioning, yet asserted that his determination was consistent with the findings of the state agency medical consultants. Finding that assertion was clearly unsupported, the court reversed and remanded the decision to allow the ALJ to explain the evidentiary basis for his RFC determination and his reasons for rejecting portions of the uncontroverted medical evidence. *Id*. at 704. In *Frantz v. Astrue*, the Court of Appeals followed its decision in *Haga* and reversed and remanded an unfavorable disability decision in part because the ALJ's RFC assessment was consistent with some, but not all, of the areas of moderate limitations identified by the state agency medical consultants and the ALJ had not explained why he selected some of the opinions and rejected others. *Frantz*, 509 F.3d at 1303.

All three of the above cases are founded on case law within the Tenth Circuit that requires the ALJ to "discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir.1996). The Fifth Circuit, however, has declined to take such a rigid approach. *See James J. Flanagan Stevedores,*

*Inc. v. Gallagher*, 219 F.3d 426, 430 (5th Cir. 2000); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

And there is nothing in the commissioner's regulations or rulings that requires an ALJ to make findings concerning each of the limitations listed on the "Summary Conclusions" portion of the review forms utilized by the SAMCs in assessing a claimant's mental residual functional capacity.[5] *See* 20 C.F.R. §§ 404.1513(c), 416.913(c); SOCIAL SECURITY RULING 96-6p.

Huber's reliance on *Hambrick v. Apfel*, 1998 WL 329368 (N.D. Tex. June 11, 1998), and *Boaz v. Massanari*, 2001 WL 1295426 (N.D. Tex. 2001), also does not support a finding of error. In both of those cases, the district court vacated and remanded the Commissioner's decisions because the ALJ had not mentioned the weight given to the SAMCs' opinions and the district court was unable to determine if the ALJ had ignored the opinions in violation of Social Security Ruling 96-6p. *Hambrick*, 1998 WL 329368 at *3; *Boaz*, 2001 WL 1295426 at *4. Neither case stands for the proposition that the ALJ must discuss each individual finding underlying the functional capacity assessment that the state agency psychologists have proposed. In Huber's case, it is apparent that the ALJ did not ignore the SAMCs' opinions, and the ALJ's explanation of the weight assigned those opinions is consistent with the purposes of the regulations and rulings that govern the

---

[5] The Commissioner's program operations manual clarifies that the "Summary Conclusions" reported by the state agency medical consultants in section I of the approved mental RFC assessment form are chiefly intended to serve as a worksheet for the SAMC's use, and it is the narrative functional capacity assessment written by the psychiatrist or psychologist in section III ("Functional Capacity Assessment") of the form that adjudicators must consider in terms of the claimant's ability to meet the mental demands of past work or other work. SOCIAL SECURITY ADMINISTRATION, PROGRAM OPERATIONS MANUAL SYSTEM § DI 25020.010. *See also id.* §§ DI 24510.060-.065 (addressing the manner in which consultants should complete the approved assessment form). The agency manual advises that the narrative should not include severity ratings or nonspecific qualifying terms (e.g., moderate, moderately severe) to describe limitations because the terms do not describe function and do not usefully convey the extent of limitation. *See id.* at § DI 24510.065. The ALJ adhered to the internal administrative requirement in Huber's case by addressing and generally endorsing the narrative assessment that Lankford provided on the mental residual functional capacity form.

assessment of medical source opinions.

Moreover, Huber has not affirmatively demonstrated prejudice as a result of any alleged procedural shortcomings in the ALJ's articulation of the weight assigned to the SAMCs' opinions. *See Hall*, 660 F.2d at 119. Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).

Huber and the Commissioner dispute the appropriate standard for prejudice. The Commissioner asserts that the appropriate standard is whether substantial evidence exists to support the Commissioner's decision despite the ALJ's failure to explicitly address every aspect of the SAMCs' assessment. *See Morris*, 864 F.2d at 335; *Hammond v. Barnhart*, 124 Fed. App'x 847, 851 (5th Cir. 2005). Huber asserts that the existence of substantial evidence is an unrelated inquiry that is no defense to an ALJ's failure to follow proper legal standards, and that she is required to show only that a different result might have been reached but for the ALJ's alleged error. *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The court need not debate the issue because Huber cannot establish prejudice under either standard.

As a threshold matter, Huber has complained of the ALJ's failure to explain why he rejected four areas of moderate limitation identified by the SAMCs, but her claims of prejudice center on the SAMCs' opinion that she is moderately limited in her ability to complete a normal workday and workweek without interruption and perform at a consistent pace. Accordingly, the court finds that Huber has not established prejudice as a result of the ALJ's alleged error in not addressing the other three areas of moderate limitation.

With respect to the fourth area of moderate limitation, Huber argues that—if accepted by the ALJ—the assessment of a moderate limitation in her ability to complete a normal workday and workweek without interruption and perform at a consistent pace would have resulted in a determination that she is unable to perform competitive employment on a sustained basis. Residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p. *See also Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A finding that a claimant can perform substantial gainful activity requires a determination that the claimant can both find work and, taking account of the claimant's exertional and non-exertional limitations, maintain employment. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002)(citing *Wingo v. Bowen*, 852 F.2d 827, 831 (5th Cir.1988)). *See also Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).

The ALJ made a specific determination in Huber's case that she was capable of the sustained performance of a restricted range of work activity, (Tr. 22), and Huber cites no authority to suggest that a moderate impairment in her ability to complete a normal workday and workweek and perform at a consistent pace renders her incapable of the sustained performance of a limited range of work crafted to accommodate her mental impairments. Her position is also contrary to the SAMCs' determination. Notwithstanding their summary finding of moderate impairment in her ability to complete a workday or workweek and perform at a consistence pace,[6] the SAMCs did not find

---

[6] Huber's argument that moderate limitation is the equivalent of an inability to sustain a normal workweek in any occupation is also contradicted by a review of the RFC assessment form used by the state agency psychologists. (Plf. Br. at 15). The worksheet that Lankford used identifies twenty mental activities, with each to be rated as "not significantly limited," "moderately limited," and "markedly limited," but Huber's interpretation would make this last rating category superfluous. (Tr. 215-16). *See generally* SOCIAL SECURITY ADMINISTRATION, PROGRAM OPERATIONS MANUAL SYSTEM § DI 24510.063 (defining marked impairment as a conclusion that the individual cannot usefully perform or sustain the activity).

Huber was disabled. Instead, they opined that she was capable of a restricted range of work, and the ALJ generally endorsed that opinion in his decision. There is no likelihood of a different outcome but for the ALJ's alleged error, nor does the ALJ's failure to more fully explain the weight given to the SAMCs' opinions cast into doubt the existence of substantial evidence to support the Commissioner's decision. Even if the court were inclined to find error, the ALJ's failure to articulate the weight given to the SAMCs' underlying summary conclusions was not detrimental to Huber's substantial rights.

The Commissioner's decision should be affirmed because Huber has not shown error or prejudice and she does not otherwise challenge the existence of substantial evidence to support the decision.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until October 20, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's

proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until October 20, 2008 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED SEPTEMBER 29, 2008.

    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE